USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/24/13

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------X

Y.S. and J.E.K., individually and on behalf of J.S.,

Plaintiffs,

-against-

NEW YORK CITY DEPARTMENT OF EDUCATION,

Defendant.

-------------------------------X

12 Civ. 2590 (WHP)

MEMORANDUM & ORDER

WILLIAM H. PAULEY III, District Judge:

Plaintiffs Y.S. and J.E.K. bring this action under the Individuals with Disabilities Education Act ("IDEA") on behalf of their minor daughter, J.S. They seek a reversal of a final administrative decision rendered by a New York State Review Officer ("Review Officer" or "SRO"), who held that the New York City Department of Education ("DOE") offered J.S. a free, appropriate public education ("FAPE") for the 2010-11 school year. The Review Officer denied the parents' request that DOE finance their child's unilateral placement at the Aaron School. In ruling for DOE, the Review Officer overturned the decision of an Impartial Hearing Officer ("Hearing Officer" or "IHO"), who had concluded that DOE failed to provide J.S. with a FAPE. Both parties move for summary judgment. For the reasons that follow, both motions are denied, and this action is remanded to the SRO to make determinations regarding certain arguments he did not consider.

## BACKGROUND

### I. J.S.'s Disability and Educational History

J.S. is a seven-year old student diagnosed with "Pervasive Developmental Disorder-Not Otherwise Specified." (Hearing Transcript ("Tr.") at 27.) She is autistic and has been diagnosed with a severe expressive, receptive, and pragmatic language disorder. (Tr. at 41.) As a result of these conditions, J.S. has deficits in fine and graphomotor skills, severe attention problems, self-stimulatory behaviors, problems with verbal communication, and language difficulties. (Tr. at 27.) She also experiences tantrums, fidgeting, body shakes, echolalia, and speaks gibberish. (Tr. at 293, 374–76.)

During the 2009-10 school year, DOE developed an individualized education program ("IEP" or "plan") placing J.S. at the Kennedy Center in an 8:1:2 classroom, i.e. eight children to one teacher and two paraprofessionals. (Tr. at 27, 739.) Unfortunately, J.S. regressed in that setting. In January 2010, J.S.'s parents removed her from the Kennedy School and provided her with full-time at-home services by Incidental Behavioral Intervention Associates ("Intervention Associates") for the remainder of the school year. (Tr. at 389-91, 746.)

### II. The 2010-11 Individual Education Plan

On April 15, 2010, a DOE Committee on Special Education ("the Committee") met to prepare J.S.'s IEP for the 2010-11 school year. (Tr. at 37.) The Committee determined that J.S.'s behaviors seriously interfered with her learning. (Decision No. 11-156 of the State Review Officer, dated Jan. 20, 2012 ("SRO Dec.") at 12.) The new IEP recommended a 12-month program in a 6:1:1 class taught by a certified special education teacher in a specialized

school in District 75. (Ex. 12[1] at 12-1, 12-22; Tr. at 42–43.) The IEP classified J.S. as autistic and recommended speech/language therapy twice a week for 30 minutes individually and once a week for 30 minutes in a group of two to address J.S.'s speech and language deficits; individual occupational training ("OT") three times a week for 30 minutes to address J.S.'s sensory and motor coordination issues; individual physical therapy ("PT") twice a week for 30 minutes to address gross motor deficits; "limited auditory and visual distractions;" "movement breaks as needed" to maintain focus; and counseling once a week for 30 minutes individually and once a week for 30 minutes in a group of two to address J.S.'s social-emotional and behavioral issues. (Ex. 12 at 12-9, 12-24; Tr. at 46.) In addition, the IEP indicated that J.S.'s "teachers and her related service providers will provide additional behavioral support when necessary." (Ex. 12 at 12-8.) The IEP had 20 annual goals and 62 short-term objectives addressing areas such as drawing, classroom participation, and impulsivity. (Ex. 12 at 12-11 through 12-21.) Some of these goals, however, were taken from J.S.'s earlier IEP, which was developed in February 2010. (Tr. at 93–94.)

On May 25, 2010, DOE sent J.S.'s parents a final notice of recommendation for the 2010-11 school year, placing J.S. at P.S. 94. P.S. 94 teachers employ the Treatment and Education of Autistic and Related Communication Handicapped Children ("TEACCH") methodology. (Ex. H; Tr. at 138.) Alison Koren taught J.S.'s assigned class, which had five students, age four to five years old. (Tr. at 129.) All the students were autistic and had difficulties with attention, speech, and abstract concepts. (Tr. at 140–41.) The children ranged from pre-kindergarten to kindergarten levels in reading and math, while J.S. was on a

[1] "Ex." citations refer to the exhibits to the underlying administrative hearing record before the IHO.

kindergarten level. (Tr. at 129, 135, 263.)

III. Unilateral Placement at the Aaron School

Meanwhile, J.S.'s parents had signed an enrollment contract with the Aaron School on March 23, 2010 for the 2010-11 school year and paid a non-refundable deposit of $8,000 toward an annual tuition of $45,675. (Exs. W, X at 3; Tr. at 31, 212.) On May 13, 2010, J.S.'s parents paid an additional installment of $12,588. (Ex. X at 5.) Because of application deadlines for private schooling, Y.S. made these payments to ensure options for his daughter in case DOE failed to make appropriate recommendations. (Tr. at 746–48.) On July 21, 2010, Y.S. and J.E.K. notified DOE that they were rejecting the IEP and placing J.S. at the Aaron School. (Ex. D; Tr. at 776-77.) Further, J.S.'s parents indicated they would augment the Aaron School's program with related services provided by the Intervention Associates and would also seek reimbursement for both. (Ex. D; Tr. at 777.)

At the Aaron School, J.S. was placed in a class with a 12:1+2 ratio with only two other autistic students. (Ex. V; Tr. at 246.) The students were either five or six years old and functioned on beginner to mid-kindergarten levels. (Tr. at 265–66.) J.S. received two 30-minute speech/language sessions per week and two 30-minute OT sessions per week, but did not receive PT. (Tr. at 225, 276.) Supplementing the Aaron School, J.S.'s parents paid for a 1:1 shadow from Intervention Associates to accompany J.S. (Tr. at 266-67, 477–84.) For another 33 hours per week, J.S. received additional Intervention Associate services outside the Aaron School. (Tr. at 472.)

IV. Administrative Proceedings

On September 2, 2010, Y.S. and J.E.K filed a due process complaint contending

that DOE denied their daughter a free, appropriate public education for the 2010-11 school year. (Ex. 1.) Specifically, they alleged that (1) the April 2010 Committee failed to develop an appropriate IEP; (2) the Committee was not properly constituted; (3) the parents were denied meaningful participation in the development of the IEP; (4) the goals and objectives in the IEP were vague, not objectively measurable, and inappropriate; (5) the 6:1:1 placement was not appropriate, and (6) the Committee failed to conduct a functional behavioral assessment and develop a behavior intervention plan. (SRO Dec. at 5.)

On October 18, 2011, after a nine-day hearing, the Hearing Officer issued her Findings of Fact and Decision, concluding that DOE failed to provide J.S. with a free, appropriate public education. (Findings of Fact and Decision, Case No. 128891, dated Oct. 18, 2011 ("IHO Dec.") at 13–15.) The Hearing Officer determined that a duly constituted team convened to develop an IEP for J.S. and that a functional behavioral assessment was necessary, based on the testimony of Dr. Salsberg (J.S.'s private neurologist). (IHO Dec. at 13.) The Hearing Officer also found that P.S. 94 would not meet J.S.'s unique needs, because it lacked an appropriate academic curriculum and utilized the TEACCH model. (IHO Dec. at 13-14.) Finally, the IHO found that J.S. made progress at the Aaron School and that the equities favored reimbursement of that tuition as well as the additional Intervention Associate services. (IHO Dec. at 14-15.)

DOE appealed the Hearing Officer's decision. On January 20, 2012, the Review Officer reversed the Hearing Officer's decision, concluding that DOE offered J.S. a free, appropriate public education. (SRO Dec. at 18.) The Review Officer determined that the Hearing Officer exceeded her jurisdiction when she found that the TEACCH methodology was

inappropriate because J.S.'s parents did not raise that issue in their complaint. (SRO Dec. at 10.) Based on his review of the record and the testimony of Dr. Bowser (a DOE psychologist) and Alison Koren (J.S.'s proposed teacher under the IEP), the Review Officer determined that the 6:1:1 placement would provide adequate support for J.S., that it was reasonably calculated to provide her with educational benefits, and that she would have been grouped appropriately in the placement. (SRO Dec. at 11.) Finally, the Review Officer determined that the Committee's failure to conduct a functional behavioral assessment or a behavior intervention plan did not deprive J.S. of a free, appropriate public education. (SRO Dec. at 12-15.)

## DISCUSSION

### I. Statutory Framework

Under the IDEA, "states receiving federal funds are required to provide all children with disabilities a free appropriate public education." Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 107 (2d Cir. 2007) (internal quotation marks omitted). To meet this requirement, the FAPE must provide "special education and related services" tailored to meet the unique needs of the particular child, 20 U.S.C. § 1401(a)(18), and it must be "reasonably calculated to enable the child to receive educational benefits." Bd. of Educ. v. Rowley, 458 U.S. 176, 207 (1982).

The Individualized Education Plan is the "centerpiece" of the IDEA. D.D. ex rel. V.D. v. N.Y.C. Bd. of Educ., 465 F.3d 503, 507 (2d Cir. 2006) (citation omitted). The plan is "a written statement that 'sets out the child's present education performance, establishes annual and short-term objectives for improvements in that performance, and describes the specially designed instruction and services that enable the child to meet those objectives.'" D.D., 465 F.3d at 508

(quoting Honig v. Doe, 484 U.S. 305, 311 (1988)).

New York State has assigned responsibility for developing the plans to local Committees on Special Education. Gagliardo, 489 F.3d at 107. Committee members are appointed by school boards or the trustees of school districts. Gagliardo, 489 F.3d at 107. Plans must provide "special education and related services tailored to meet the unique needs of a particular child, and be reasonably calculated to enable the child to receive educational benefits." Gagliardo, 489 F.3d at 107 (citation omitted). "A school district fulfills its substantive obligations under the IDEA if it provides [a plan] that is likely to produce progress, not regression, and if the [plan] affords the student with an opportunity greater than mere trivial advancement." T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist., 554 F.3d 247, 254 (2d Cir. 2009) (internal quotation marks omitted).

Parents may challenge the adequacy of their child's plan in an impartial "due process" hearing before a Hearing Officer appointed by the local board of education. Gagliardo, 489 F.3d at 108 (citations omitted). The Hearing Officer's decision may be appealed to a Review Officer, and the Review Officer's decision may be challenged in state or federal court. Gagliardo, 489 F.3d at 108. The district court may "receive the records of the administrative proceedings" and "hear additional evidence" to address that challenge. 20 U.S.C. § 1415(i)(2)(C). Then the district court "shall grant such relief as the court determines is appropriate," "basing its decision on the preponderance of the evidence." 20 U.S.C. § 1415(i)(2)(C). Under the IDEA, appropriate relief may include reimbursement to the parents for the cost of a private education. See Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 246 (2009).

II. Legal Standard

Summary judgment in an IDEA case serves as "a pragmatic procedural mechanism for reviewing" an administrative determination. Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005). "While the district court must base its decision on the preponderance of the evidence, it must give due weight to the administrative proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." T.Y. v. N.Y.C. Dep't of Educ., 584 F.3d 412, 417 (2d Cir. 2009) (citation omitted). When "an IHO and the SRO reach conflicting conclusions, [courts] defer to . . . the SRO's decision." R.E. v. N.Y.C. Dep't of Educ., 694 F.3d 167, 189 (2d Cir. 2012). But judicial deference is not absolute. Rather, "a court must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead." R.E., 694 F.3d at 189.

Of course, "[i]n many determinations made by administrative officers, the district court's analysis will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive, for example whether the decision being reviewed is well-reasoned, and whether it was based on substantially greater familiarity with the evidence and the witnesses than the reviewing court." M.H. v. N.Y.C. Dep't of Educ., 685 F.3d 217, 244 (2d Cir. 2012). "But the district court's determination of the persuasiveness of an administrative finding must also be colored by an acute awareness of institutional competence and role. As the Supreme Court made clear in Rowley, the purpose of the IDEA is to provide funding to states so that they can provide a decent education for disabled students consistent with their traditional

role in educating their residents." M.H., 685 F.3d at 244. "In policing the states' adjudication of IDEA matters, the courts are required to remain conscious of these considerations in determining the weight due any particular administrative finding." M.H., 685 F.3d at 244.

Further, New York law allocates the burden of persuasion and production to the school district in an impartial hearing. See N.Y. Educ. Law § 4404(1)(c). But "[b]ecause the [SRO] . . . concluded that the IEP[] [was] proper, and the courts are bound to exhibit deference to that decision, the burden of demonstrating that the . . . [SRO] erred is properly understood to fall on the plaintiffs." M.H., 685 F.3d at 225 n.3. And to the extent a court "must determine whether the state administrative decisions were supported by a preponderance of the evidence, which party bore the burden of persuasion in the state review scheme is only relevant if the evidence was in equipoise." M.H., 685 F.3d at 225 n.3. "Procedural violations warrant tuition reimbursement only if they impeded the child's right to a FAPE, significantly impeded the parents' opportunity to participate in the decision-making process, or caused a deprivation of educational benefits. That is, parents must articulate how a procedural violation resulted in the IEP's substantive inadequacy or affected the decision-making process." M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ., 725 F.3d 131, 139 (2d Cir. 2013) (internal alterations and citations omitted).

III. Adequacy of the Plan

Reimbursement for private school tuition is appropriate if the evidence shows "(1) that the proposed IEP was inadequate to afford the child an appropriate public education, and (2) that the private education services obtained by the parents were appropriate to the child's needs." Walczak v. Fla. Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998) (citing Sch. Comm. of

Burlington v. Dep't of Educ. of Mass., 471 U.S. 359, 370 (1985)); Florence Cnty. Sch. Dist. Four v. Carter, 510 U.S. 7, 12-14 (1993)). Parents must also show "that the equities favor them." R.E., 694 F.3d at 185 (citing Cerra v. Pawling Cent. Sch. Dist., 427 F.3d 186, 192 (2d Cir. 2005)). In determining whether the proposed plan was inadequate, courts examine (1) whether the IEP was developed according to the IDEA's procedural requirements and (2) whether the IEP is substantively appropriate in that it is "reasonably calculated to enable the child to receive educational benefits." A.C. ex rel. M.C. v. Bd. of Educ., 553 F.3d 165, 171 (2d Cir. 2009) (internal quotations and citations omitted).

A. Arguments Not Raised in Plaintiffs' Due Process Complaint or Cross-Appealed

Several of Plaintiffs' arguments were not raised in their due process complaint before the Hearing Officer. One additional argument that was raised in their complaint was not cross-appealed to the Review Officer. DOE challenges J.S.'s parents' efforts to raise these arguments before this Court.

1. Least Restrictive Environment

The IDEA requires that students with disabilities be educated "to the maximum extent appropriate" with peers who are not disabled. 20 U.S.C. § 1412(a)(5). Thus, "special education and related services must be provided in the least restrictive setting consistent with a child's needs." Walczak, 142 F.3d at 122. J.S.'s parents now contend, for the first time in these proceedings, that the IEP placed J.S. in an overly restrictive setting. A party requesting a due process hearing "shall not be allowed to raise issues at the due process hearing that were not raised in the notice . . . unless the other party agrees otherwise." M.H., 685 F.3d at 250 (citing 20 U.S.C. § 1415(f)(3)(B)). Because J.S.'s parents did not include a least restrictive environment

claim in their due process complaint, and it was not addressed by either the Hearing Officer or the Review Officer, that claim is waived and this Court will not consider it. See, e.g., R.C. ex rel. M.C. v. Byram Hills Sch. Dist., 906 F. Supp. 2d 256, 269 (S.D.N.Y. 2012); C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ., No. 11 Civ. 00157 (LTS), 2011 WL 5130101, at *12 (S.D.N.Y. Oct. 28, 2011).

2. TEACCH Methodology

J.S.'s parents refute the Review Officer's conclusion that the Hearing Officer exceeded her jurisdiction by considering the appropriateness of the TEACCH methodology—another issue that was not raised in the due process complaint. They assert that this claim is not waived, because DOE "opened the door" by eliciting testimony about the TEACCH method to bolster the IEP and by cross examining Dr. Salsberg "at length" on his understanding of teaching methodologies. (P.'s Br. at 23-24.) While Plaintiffs' failure to raise this issue would normally foreclose judicial review, DOE is not permitted "to argue issues outside the scope of the due process complaint without 'opening the door' for the plaintiffs." M.H., 685 F.3d at 250. When DOE defends the IEP's placement on the basis of teaching methodology, "the [IDEA] does not bar the parents from contesting the appropriateness of the methodologies offered in the IEP's recommended program." M.H., 685 F.3d at 251.

This Court concludes that DOE "opened the door" to J.S.'s challenge to the teaching methodology. See M.H. v. N.Y.C. Dep't of Educ., 712 F. Supp. 2d 125, 148–52 (S.D.N.Y. 2010), aff'd, 685 F.3d 217 (2d Cir. 2012). As in M.H., DOE was the first to raise the issue of methodology when it examined Koren, J.S.'s proposed teacher under the IEP. See M.H., 712 F. Supp. 2d at 149. When Koren was asked about "support or resources" she received from

P.S. 94, she responded that a head teacher had been trained on how to implement the TEACCH system and "her goal [was] to push into the classroom and help out the classroom teachers with implementing the TEACCH structures inside their classrooms." (Tr. at 130.) When DOE later asked Koren how she would have addressed J.S.'s struggles with attention span, Koren responded, "Like I stated earlier, we're a TEACCH school, so we have the students on individualized schedules and we keep things short. You know, they learn a skill and move on . . . . So it addresses the hyperactivity where she can move around a lot." (Tr. at 138.). Likewise, when DOE asked Koren how she would implement J.S.'s goal of demonstrating an increased attention span, she responded, "we use the TEACCH structure, and part of the TEACCH structure is students having individual workstations where they learn how to work independently." (Tr. at 146-47.) Koren also indicated that the TEACCH methodology offered a predictable schedule that could reduce anxiety. (Tr. at 138). Through this testimony, DOE elicited Koren's "express or implied opinion" that the use of particular methodologies made the program appropriate for J.S. M.H., 712 F. Supp. 2d at 150.

Further, DOE also did not object when Dr. Salsberg testified that a "TEACCH model class . . . is really not the appropriate approach for [J.S.] I've seen TEACCH model classes that work for some children, but when we're talking about her individualized complex needs, that class would not meet her needs[.]" (Tr. at 570). Instead, DOE cross-examined Dr. Salsberg extensively on the basis for his opinion and his knowledge of the TEACCH method. (Tr. at 573-74, 578-80, 583.) Thus, DOE "cannot genuinely claim that it was prejudiced by the IHO's consideration of such evidence." M.H., 712 F. Supp. 2d at 150. Under these circumstances, Plaintiffs "cannot fairly be barred from rebutting this testimony with evidence of

the appropriateness of those methodologies." M.H., 712 F. Supp. 2d at 150.

Because the SRO did not review the IHO's determination that the TEACCH model was inappropriate for J.S., this Court remands that question to the Review Officer for additional findings. See D.N. v. N.Y.C. Dep't of Educ., 905 F. Supp. 2d 582, 588-89 (remand to SRO is appropriate when SRO did not consider "an alternative basis for granting the Parent tuition reimbursement."); see also Gagliardo v. Arlington Cent. Sch. Dist., 373 F. Supp. 2d 460, 461 (S.D.N.Y. 2005) (remand of an IDEA case is appropriate where the "parties would be better served by having a SRO's ruling on the subject").

3. Sufficiency of the Goals in the IEP

Finally, J.S.'s parents assert that the IEP included vague goals and other goals that were recycled from a prior IEP. An IEP must contain "short-term and long-term academic and nonacademic goals for each student, as well as evaluative procedures for measuring a student's progress." M.H., 685 F.3d at 245 (citing 34 C.F.R. § 300.320(a)(2)-(3); N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 8, § 200.4(d)(2)(ii)). DOE contends that the adequacy of the IEP's goals is not properly before this Court because J.S.'s parents failed to cross-appeal that issue to the Review Officer. An appeal to the SRO can be brought by "[a]ny party aggrieved by the findings of fact and the decisions of an impartial hearing officer." NYCRR tit. 8 § 200.5(k)(1). J.S.'s parents assert that they did not need to cross-appeal because they were not "aggrieved" by the IHO's decision. There is a split in authority on this question. Compare C.F., 2011 WL 5130101, at *12 (holding that plaintiffs who did not cross-appeal issue not reached by IHO waived right to challenge it in federal court) with D.N., 905 F. Supp. 2d at 587–88 (finding that plaintiffs only needed to cross-appeal issues not reached by IHO if they were aggrieved by the decision); F.B.

v. N.Y.C. Dep't of Educ., 923 F. Supp. 2d 570, 587-88 (S.D.N.Y. 2013) (same); J.F. v. N.Y.C. Dep't of Educ., No. 12 Civ. 2184 (KBF), 2012 WL 5984915, at *9 (S.D.N.Y. Nov. 27, 2012) (same).

This Court agrees with J.S.'s parents. The issue regarding the goals was identified in the parents' due process complaint and therefore placed before the Hearing Officer. Simply put, "an IHO's failure to decide an issue for or against a party does not 'aggrieve' that party in the ordinary sense of that word." J.F., 2012 WL 5984915, at *9. J.S.'s parents were not aggrieved, since the Hearing Officer found that they were entitled to reimbursement. "[T]he Parents' failure to cross-appeal an issue not addressed by the IHO one way or the other does not and should not prevent that issue from being preserved for review by the SRO." F.B., 923 F. Supp. 2d at 588 (citation omitted). Therefore, the parents "'had neither the responsibility nor the right' to cross-appeal any portion of the IHO's decision." D.N., 905 F. Supp. 2d at 588 (quoting Antkowiak by Antkowiak v. Ambach, 838 F.2d 635, 641 (2d Cir. 1988)).

Because neither the Hearing Officer nor the Review Officer considered the adequacy of the goals, remand to the Review Officer on this issue is also appropriate. See Gagliardo, 489 F.3d at 113 ("[T]he judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy."). The SRO, on the other hand, is "uniquely well situated to review the content and implementation of the Student's IEP." D.N., 905 F. Supp. 2d at 589 (citing Polera v. Bd. of Educ., 288 F.3d 478, 487 (2d Cir. 2002)).

B. Procedural Compliance

In addition to the sufficiency of the goals, J.S.'s parents also contend that the IEP

did not comply with the IDEA's procedural requirements because DOE failed to perform a functional behavioral assessment or behavior intervention plan for J.S. Not all procedural violations result in the denial of a free, appropriate public education. R.E., 694 F.3d at 190. Instead, procedural inadequacies must have "(I) impeded the child's right to a free appropriate public education; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).

New York regulations require DOE to conduct a functional behavioral assessment for a student, like J.S., "whose behavior impedes . . . her learning or that of others." NYCRR tit. 8 § 200.4(b)(1)(v). A functional behavioral assessment includes the "identification of the problem behavior, the definition of the behavior in concrete terms, the identification of the contextual factors that contribute to the behavior . . . and the formulation of a hypothesis regarding the general conditions under which a behavior usually occurs and probable consequences that serve to maintain it." NYCRR tit. 8 § 200.1(r). In addition to conducting an assessment, the Committee "shall consider the development of a behavioral intervention plan" for a student "with persistent behaviors that impede . . . her learning or that of others." NYCRR tit. 8 § 200.22(b).

The failure to conduct a functional behavioral assessment is "a serious procedural violation" because it may prevent the Committee "from obtaining necessary information about the student's behaviors," leading to a flawed IEP. R.E., 694 F.3d at 190. However, the failure to conduct a functional behavioral assessment does not rise to a denial of a free, appropriate public

education if the IEP adequately identifies the student's problem behaviors and prescribes ways to manage them. R.E., 694 F.3d at 190. "[W]hen [a functional behavioral assessment] is not conducted, the court must take particular care to ensure that the IEP adequately addresses the child's problem behaviors." R.E., 694 F.3d at 190.

In determining that the failure to perform an assessment did not deprive J.S. of a free, appropriate public education, the Review Officer noted that the IEP identified J.S.'s behaviors "to include occasional resistance, self-directed behavior, hyperactivity, and short attention span." (SRO Dec. at 15.) But in concluding that the IEP adequately addressed J.S.'s behavior, the SRO relied in part on the IEP's inclusion of "annual goals addressing needs related to the student's ability to attend and perform as a member of a group in class, to understand personal space, to reduce impulsivity and to improve independence." (SRO Dec. at 15.) A Review Officer cannot decline to consider the sufficiency of the IEP goals, but then use them as a basis to excuse DOE's failure to conduct a functional behavioral assessment or a behavior intervention plan. Therefore, the Review Officer is directed to reconsider his findings regarding the failure to perform a functional behavioral assessment once he determines whether the IEP goals were sufficient.

C. Substantive Adequacy

The Review Officer concluded that DOE provided a FAPE for J.S's 2010-11 school year. A Review Officer's determinations regarding the substantive adequacy of an IEP are entitled to heightened judicial deference. M.H., 685 F.3d at 244. Nevertheless, J.S.'s parents contend that the SRO committed several errors regarding the IEP's substantive adequacy. In addition to the least restrictive environment and TEACCH methodology arguments outlined

above, J.S.'s parents also contend that the IEP was not calculated to confer educational benefit because the 6:1:1 placement at P.S. 94 was inappropriate and J.S. would not have been functionally grouped with other students in that classroom.

DOE's substantive obligations under the IDEA require it to provide "an IEP that is likely to produce progress, not regression" and that "affords the student with an opportunity greater than mere trivial advancement." A.C., 553 F.3d at 173. The Review Officer determined that the 6:1:1 placement was appropriate for J.S. because she required a small class with additional supervision. (SRO Dec. at 11.) His determination was based on Dr. Bowser, who evaluated J.S. and determined that her parents' suggested alternative placements were inappropriate because J.S. could not follow a general education curriculum. (SRO Dec. at 12.) Further, the Review Officer noted that state regulations do not permit a class to exceed six students where the students' management needs are "highly intensive" and require a "high degree of individualized attention and intervention." (SRO Dec. at 15, citing NYCRR tit. 8 § 200.6.)

In addition, the Review Officer noted that the IEP provided J.S. with related services, including speech/language therapy twice a week for 30 minutes individually and once a week for 30 minutes in a group of two, as well as counseling, OT, and PT. (SRO Dec. at 18.) J.S.'s parents note that Dr. Blaustein, a speech pathologist who evaluated J.S., recommended five hours of speech therapy per week, as did the Intervention Associate professionals who worked with J.S. They contend the SRO improperly ignored Dr. Blaustein's expertise in favor of Dr. Bowser, who determined that three 30 minute sessions per week satisfied J.S.'s need for "intensive" speech and language therapy. (Tr. at 117.) Because this Court declines to choose

between conflicting opinions of educational experts, it defers to the Review Officer's conclusion that Dr. Bower's recommendation was sufficient. See R.E., 694 F.3d at 189.

Finally, J.S.'s parents argue that the Review Officer ignored the testimony of Dr. Salsberg, which the Hearing Officer credited. (IHO Dec. at 13.) According to Dr. Salsberg, the students who attend District 75 classes "do not have the cognitive and academic ability that [J.S.] possessed." (Tr. at 569.) State regulations require that students in special education classes be suitably grouped for instructional purposes with students with similar needs. Walczak, 142 F.3d at 123 (citing NYCRR tit. 8 § 200.6). But Dr. Salsberg did not observe J.S.'s proposed class, and he did not know who her classmates would have been. (Tr. at 569, 572-3.) The SRO's reliance on Koren's firsthand testimony over the speculative testimony of Dr. Salsberg warrants deference. Cerra, 427 F.3d. at 191 ("In reviewing the administrative proceedings, it is critical to recall that IDEA's statutory scheme requires substantial deference to state administrative bodies on matters of educational policy.") As noted by the Review Officer, Koren testified that J.S.'s assigned class consisted of six students, age four to five years old, all of whom had autism. (Tr. at 128-29, 140, 177-80; SRO Dec. at 17.) Koren testified that the functional math and reading levels of the students were pre-kindergarten to kindergarten, and therefore in line with J.S.'s kindergarten levels. (Tr. at 129-30, 263; SRO Dec. at 17.) Koren also placed students in groups according to ability and provided students with differentiated instruction and individual attention. (Tr. at 140-146; SRO Dec. at 17-18.) There is no basis to conclude that that placement deprived J.S. of a FAPE based on functional grouping or that the academic instruction in math, reading and writing offered by Koren in the 6:1:1 placement was deficient. While this Court rejects Plaintiffs' arguments that the IEP was not reasonably calculated to provide educational benefit as

outlined above, it remands to the Review Officer to determine whether the TEACCH method would render the IEP substantively inadequate.

CONCLUSION

For the foregoing reasons, the Plaintiffs and Defendant's motions for summary judgment are denied. This action is remanded to the State Review Officer with directions to consider Plaintiffs' arguments regarding 1) use of the TEACCH methodology; 2) the sufficiency of the goals in the Individual Education Plan; and 3) whether the Department of Education's failure to perform a functional behavioral analysis and behavior intervention plan amounted to the denial of a free and appropriate public education for J.S. The Clerk of Court is directed to terminate all pending motions and mark this case closed.

Dated: September 24, 2013
New York, New York

SO ORDERED:

WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record:*
Christina D. Thivierge, Esq.
Thivierge & Rothberg, P.C.
5 Hanover Square, Suite 1201
New York, NY 10004
*Counsel for Plaintiffs*

Eric B. Porter, Esq.
New York City Law Department
100 Church Street
New York, NY 10007
*Counsel for Defendant*